NOT FOR PUBLICATION OR CITATION

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON

CIVIL ACTION NO. 04-CV-318-JBC

RONALD K. BILDERBECK                                                    PLAINTIFF

VS:                          **MEMORANDUM OPINION AND ORDER**

BUREAU OF PRISONS, ET AL.                                              DEFENDANTS


This matter is before the court on the motion of the two federal defendants, the Federal Bureau of Prisons (BOP) and Dr. Michael Growse, for dismissal of this case against them or alternatively for summary judgment in their favor [Record No. 34]. Fully advised, the court will partially grant and partially deny the defendants' motion.

BACKGROUND

On July 13, 2004, Ronald K. Bilderbeck, who was then incarcerated in the Federal Medical Center ("FMC") in Lexington, Kentucky, filed this *pro se* civil rights complaint, pursuant to 28 U.S.C. § 1331 and the doctrine announced in *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971).

The plaintiff named the Federal Bureau of Prisons ("BOP"), certain BOP personnel, and two private doctors as defendants, and he alleged that they had been deliberately indifferent to his serious medical needs in violation of the U.S. Constitution's Eighth Amendment prohibition against cruel and unusual treatment; and

had committed malpractice and negligence.  Mr. Bilderbeck has sought a jury trial,

injunctive relief in the form of appropriate medical treatment,  and damages, including

punitive damages.

Upon review of the initial pleadings, on September 2, 2004, the court granted

the plaintiff's motion to proceed *in forma pauperis* and summarized the plaintiff's

allegations[1] as follows:

> The plaintiff states that he came into BOP custody in May of
> 1997, with the federal judge's recommendation that he go to a medical
> facility because of an injury to his knee and hip which he suffered while
> in a county jail.  He began service of his sentence at FCI-McKean, in
> Pennsylvania, where he remained for two years without any treatment.
> The plaintiff specifically claims that by the time he was transferred
> elsewhere briefly and then to FMC-Lexington on February 29, 2000, he
> had become "a cripple."  Therefore, he filed a lawsuit against the BOP
> and a Dr. Olson at the McKean facility, Civil Action # 00-86E.  The
> plaintiff states that he later amended the complaint therein to add two of
> the defendants named herein.  However, in 2003, the plaintiff explains,
> the court dismissed the BOP "on a technical point," and dismissed Drs.
> Vaughan and Grouse, without prejudice, because they were "from
> Kentucky," which this court construes to mean that they were dismissed
> for the Pennsylvania court's lack of personal jurisdiction over them.
>
> The plaintiff herein complains of his medical treatment with regard
> to two different medical conditions.  The first was a hip replacement
> surgery by Defendant Vaughan, described as "a contract doctor," . . .
> in June of 2000. . . [with a subsequent dislocation later in 2000 and a
> surgical repair in 2002].
>
> The plaintiff claims that because the corrective hip surgery was
> delayed, he developed a second medical condition, having pain and
> problems with his knees, back, and hip.  In August of 2003, with his
> Pennsylvania case scheduled to be heard the following month, the
> plaintiff was taken to see a neurosurgeon, Dr. Blades, now a defendant

---

[1]     The allegations are contained not only in the original complaint
[Record No. 1], but also in two later-filed amendments [Record Nos. 4, 6].

herein.  On August 26, 2003, the plaintiff had back surgery, performed by Dr. Blades at the University of Kentucky Hospital.  Upon his return to the prison, the plaintiff purportedly experienced numbness in the left side of his face, from his neck to his forehead, and in his right leg, from his hip to his ankle.  When the plaintiff saw Dr. Blades again, in September, the doctor recommended an orthopedic consult and MRI that afternoon. Before these results were available, however, the next morning, the plaintiff was taken to Pennsylvania for the trial against Dr. Olson.

The plaintiff alleges that he returned to FMC-Lexington 30 days later, "in worse condition than when I left."  After efforts by the plaintiff, Dr. Blades, and his new treating physician, named Dankwa, 5 months later he finally did see a neurologist.  On March 16, 2004, the neurologist agreed that something is wrong; allegedly "recommended help for me" ordering an MRI of the head and cervical spine; and said that he wanted to see the plaintiff back at his clinic as soon as possible.  Still, the plaintiff alleges, that is the only attention he has received to date.

The plaintiff criticizes . . . Dr. Blades with regard to his back surgery; he also charges that Dr. Blades changed his attitude from helping to impeding the plaintiff's treatment once he became a contract physician for the BOP.[2]  The plaintiff blames FMC-Lexington's Medical Director, Defendant Grouse [sic],[3] for the denial and/or delays in his receiving medical treatment with regard to both surgeries.  Dr. Grouse is purportedly biased against the plaintiff, because Bilderbeck questioned him "about why he didn't allow Dr. Vaughan to stabilize my hip replacement."  Moreover, Dr. Grouse's behavior continues, the plaintiff claiming that his current doctor, Dr. Dankwa, and a physical therapist named Nestor have both told him that every recommendation they make is denied by Dr. Grouse.

The plaintiff alleges exhaustion of the BOP administrative remedy process [Record No. 1], and he also provides copies of the documents exchanged in that process, Administrative Remedy No. 311302 [Record No. 4], starting in September of 2003 . . . [and ending with the] Response of National Office, dated January 30, 2004.

---

[2]      Since the time of the Court's screening, it has become obvious that Dr. Blades is a woman, not a man.

[3]      The correct spelling of this defendant's name in his pleadings is "Growse."

3

> According to the plaintiff, . . . other than the one neurology consult in March of 2004, since the September 15, 2003, follow-up appointment with Dr. Blades after his back surgery, he has not seen Dr. Blades again; has not had the orthopedic consult which Dr. Blades ordered; and has not received any aftercare or physical therapy to date. The plaintiff describes his current condition as serious and as including the following:
>
> > Both knees have ligament damage . . . My right hip will need to be replaced very shortly . . . I am having trouble with the muscles around my left hip . . . My lower back is hurting and when I sit for a long period of time I lose strength in both legs, especially the left as it goes numb and I have to drag it . . . The left side of my face is still numb and I still get headaches off and on, my left eye hurts me late in the day. . . .
>
> Record No. 6 at 10.   The plaintiff contends that despite the recommendations of Dr. Blades in September of 2003 and the neurologist's in March of 2004, he has yet to receive any of the recommended treatment.

Record No. 12 at 2-5.  At the conclusion of the memorandum opinion and order, the court dismissed two of the defendants and all claims springing from the plaintiff's 2000 and 2002 hip replacement surgeries and aftercare; and ordered that summons issue and be served on the remaining defendants, *i.e.*, the BOP, Dr. Growse, and Dr. Blades, in their official and individual capacities.

The docket shows that at the time of the court's order, the plaintiff was being transferred from FMC-Lexington to the Low Security Correctional Institution in Butner, N.C., where he is now incarcerated.  Also in September of 2004, the U.S. Marshal Service returned Defendant Blades's summons unexecuted [Record No. 14].

## DEFENDANTS' MOTION

Defendants BOP and Dr. Growse, by counsel, have responded to the complaint

4

with a motion to dismiss, or in the alternative, for summary judgment, and they have also submitted a supporting memorandum, copies of unpublished case law in the Sixth Circuit, and numerous other exhibits [Record Nos. 34-35].

The defendants give additional facts about the plaintiff, including the fact that he is in his sixties, having been born in 1941; he was sentenced to 240 months' incarceration for a drug- trafficking conviction; and his projected release date is November 9, 2014.  They confirm that the plaintiff was at FMC-Lexington from February of 2000 until September 2, 2004, when he was transferred to his current facility in North Carolina.

Dr. Growse submits a declaration about the plaintiff's medical care during his 4-year incarceration at FMC-Lexington, and he attaches supporting medical records. Exh. B.  According to Dr. Growse, it was he who made the final decisions regarding approval for surgery, consultations, and other special procedures during the plaintiff's stay in Lexington, and one of these was to authorize his being sent to the University of Kentucky ("UK") Hospital for back surgery.  Dr. Blades's services were only to perform the surgery and otherwise care for him in her capacity as an employee of that hospital.

It is Dr. Growse's position that the plaintiff did have several necessary medical procedures, but not as many as the plaintiff would have liked.  He was given medically appropriate care before and after his back surgery and was denied requests for additional procedures based upon "the lack of any objective medical findings . . . and

the lack of medical soundness to his subjective complaints." Dr. Growse goes on to recount the plaintiff's care chronologically, with reference to the attached medical documents, which will be discussed below.

With regard to the law, the defendants contend that the damage claims against the BOP and Dr. Growse in his official capacity are barred by the doctrine of sovereign immunity and, therefore, that dismissal is appropriate pursuant to Federal Rule of Civil Procedure 12 (b)(1). Dr. Growse, in his individual capacity, argues that he should be dismissed because (1) the plaintiff has failed to state an Eighth Amendment claim, thus warranting dismissal under Federal Rule of Civil Procedure 12 (b)(6); or (2) this defendant is entitled to qualified immunity, thus making summary judgment in his favor appropriate under Rule 56.

## PLAINTIFF'S RESPONSE

In his response [Record No. 39], the plaintiff admits that sovereign immunity bars his recovery from the BOP and from Dr. Growse in his official capacity. Further, he admits that Dr. Blades's conduct did not reach the level of a constitutional violation, and he moves the court to dismiss her without prejudice. After discussing the standards for summary judgment, he insists that issues of material fact preclude entry of summary judgment in the defendants' favor.

In his affidavit, signed in July of 2004, the plaintiff counters Defendant Growse's factual statements. The plaintiff also expresses anger at the defendant's suggestion that he needed no further treatment when he was medically cleared for the

transfer to North Carolina.  He tells of various medical procedures and findings which occurred in his new location, and he attaches exhibits in support of his allegations as to his treatment at both Lexington and Butner.

The plaintiff also denies many of the contentions of Dr. Growse in his declaration, Bilderbeck's last attachment being a January 17, 2004, letter from Dr. Growse to the BOP national office, presumably as part of the BOP administrative remedy process, wherein the doctor recounted his treatment of the plaintiff "personally," and the prisoner has underlined portions with comments such as "none of this happened."

The plaintiff contends that Dr. Growse made him suffer needlessly, showing deliberate indifference to his serious medical needs on multiple occasions, thereby violating the Eighth Amendment prohibition against cruel and unusual punishment and making his actions objectively unreasonable so as to bar the protection of qualified immunity.  In addition to asking this court to deny the defendants' motion, the plaintiff asks that the court analyze his negligence claim against Dr. Growse under the Federal Torts Claim Act ("FTCA").  To the extent the court would find that he has not exhausted his administrative remedies under the FTCA, he asks that his negligence claim "be dismissed with leave to reinstate."

<u>REPLY</u>

The federal defendants have filed a reply [Record No. 40], focusing on the services which Dr. Growse did provide for the plaintiff and the lack of objective

7

findings supporting a need for further medical procedures for him.  Dr. Growse objects

to the plaintiff's "attempting to have the Court use hindsight in critiquing medical

diagnoses that were made and treatment that was rendered" after his August 2003

surgery, in light of the medical evaluation he received more than a year later, in

December 2004, when he was evaluated at FCI-Butner.

## APPLICABLE STANDARDS

To state a claim that is cognizable as an action pursuant to 28 U.S.C. § 1331

and *Bivens,* the plaintiff must plead two essential elements:  that the defendants

deprived him of rights secured by the Constitution or laws of the United States and

that they acted under color of federal law.  *Bivens*, 403 U.S. at 397.

Under Federal Rule of Civil Procedure 12(b)(6), dismissal is available if the

claimant fails to state a claim upon which this court may grant relief.  Additionally, the

rule continues, in pertinent part, as follows:

> If, on a motion asserting the defense numbered (6) to dismiss for
> failure of the pleading to state a claim upon which relief can be granted
> matters outside the pleading are presented to and not excluded by the
> court, the motion shall be treated as one for summary judgment and
> disposed of as provided in Rule 56, and all parties shall be given
> reasonable opportunity to present all material made pertinent to such a
> motion by Rule 56.

Fed.R.Civ.P. 12(b)(6).  Because the court considers the declaration of Defendant

Growse attached to their motion, the court will treat the instant motion as one for

summary judgment.

In determining a motion for summary judgment, the Court must conclude that

8

there are "no genuine issues as to any material fact and the moving party is entitled to a judgment as a matter of law."  Federal Rule of Civil Procedure 56(c).  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corporation v. Catrett*, 477 U.S. 317, 322 (1986).  A court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial.  *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The significant question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-53 (1986).

The moving party has the burden of showing there is an absence of evidence to support a claim.  *Id.* at 324-25.  After the movant carries that burden, the non-moving party must go beyond the pleadings to designate by affidavits, depositions, answers to interrogatories, and admissions on file specific facts showing that there is a genuine issue of material fact for trial.  *Id.*  If the non-movant completely fails to prove an essential element of his or her case, then all other facts are rendered immaterial.  *Id.* at 322-23.

Because the instant defendants contend both that the plaintiff has failed to meet the applicable standards for his constitutional claim and that Defendant Growse is

9

entitled to qualified immunity, the court examines the standard for the latter as well. "Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

There is a tripartite procedure for evaluating claims of qualified immunity, the first step of which is to determine whether a constitutional violation occurred. *See Dickerson v. McClellan*, 101 F.3d 1151, 1157-58 (6th Cir. 1996).   Therefore, the question of whether the named defendants are entitled to qualified immunity is the same as the initial *Bivens* question herein, *i.e.*, whether the plaintiff has established that a constitutional violation occurred.  The plaintiff has the burden of establishing both that his rights were violated and that the defendants are not entitled to qualified immunity.  *Wegener v. Covington*, 933 F.2d 390, 392 (6th Cir. 1991); *Williams v. Mehra*, 186 F.3d 685, 692-93 (6th Cir. 1999) (quoting *Celotex,* 477 U.S. at 322).

<u>DISCUSSION</u>

Certain matters are undisputed.  Conceding  that Dr. Blades's conduct does not rise to the level of a constitutional violation, the plaintiff moves to dismiss the complaint against her, without prejudice.  The federal defendants do not oppose the motion.  Also, the parties agree that the BOP and Dr. Growse in his official capacity are entitled to dismissal from the instant lawsuit.

As the defendants have argued and the plaintiff acknowledges, a lawsuit against

10

an agency of the United States is, in essence, a suit against the United States. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985). The federal courts do not have jurisdiction to consider actions for monetary damages against the United States unless sovereign immunity has been waived. *United States v. Mitchell*, 463 U.S. 206, 212 (1983). "In a suit against the United States, there cannot be a right to money damages without a waiver of sovereign immunity." *United States v. Testan*, 424 U.S. 392 (1976); *see also Will v. Michigan Dept. of State Police*, 109 S.Ct. 2304 (1989); *Kentucky v. Graham*, 473 U.S. at 166. The United States has not waived its sovereign immunity to monetary damages for constitutional torts, and so the United States and its agencies are immune from suit under the civil rights statutes upon which the plaintiff relies. *See Savage v. United States*, 450 F.2d 449, 451 (8th Cir. 1971) (42 U.S.C. §1983), *cert. denied*, 405 U.S. 1043 (1972); *Smallwood v. United States*, 358 F.Supp. 398 (E.D. Mo.) (42 U.S.C. § 1985), *aff'd*, 486 F.2d 1407 (8th Cir. 1971).

The plaintiff may not avoid the bar of sovereign immunity simply by naming federal officers of the United States as defendants. *Ecclesiastical Order of the Ism of Am v. Chasin*, 845 F.2d 113, 115 (6th Cir. 1988) (citing *Hutchinson v. United States*, 677 F.2d 1322, 1327 (9th Cir. 1982)). When damages are sought against federal employees in their official capacities, the damages in essence are sought against the United States, and such claims cannot be maintained. *Myers & Myers, Inc. v. United States Postal Serv.*, 527 F.2d 1252, 1256 (2d Cir. 1975); *Morris v. United States*,

11

521 F.2d 872, 874-75 (9th Cir. 1975).  *Davis v. Passman*, 442 U.S. 228 (1979), allows federal jurisdiction under 28 U.S.C. § 1331 for damages against the federal defendants only in their individual capacities and only where the conduct rises to the level of a constitutional violation.

Thus, Dr. Blades will be dismissed, without prejudice, at the plaintiff's request. Also, that defendant has apparently never been served in the 10 months since the filing of the instant complaint.  Fed.R.Civ.P. 4(m):  an alternate ground for her dismissal without prejudice.  With regard to Defendant Growse, it is also appropriate to dismiss the plaintiff's negligence claims without prejudice, for an admitted failure to exhaust his FTCA administrative remedies.  *See* 28 U.S.C. § 2675(a); *Tinker-Bey v. Meyers*, 800 F.2d 710 (7th Cir. 1986).

Additionally, the plaintiff's Eighth Amendment claims for damages from the BOP and Defendant Growse in his official capacity will be dismissed with prejudice, as such claims are barred by the doctrine of sovereign immunity.  *Garcia v. United States*, 666 F.2d 960 (5th Cir. 1982), *cert. denied*, 459 U.S. 832 (1983).  Although the parties do not address the status of the plaintiff's claims for injunctive relief, the court will dismiss them on the ground that they are moot, in light of his transfer from FMC-Lexington.  *Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir.1996).

As to the remaining claim, the constitutional claim for damages from Dr. Growse in his individual capacity, the parties evidently concur that when Plaintiff first came to FMC-Lexington, Dr. Blades's recommendation was to give attention to one medical

issue at a time; so full attention was first given to the hip problem, resulting in the 2000 left hip replacement and subsequent surgical revision in 2002.  According to the defendant, the plaintiff was given only a physical therapy regimen for his back during this time.

After his hip repair, the plaintiff complained of worsening back pain, with pain down both hips and legs, as well as numbness and tingling, especially after sitting. Declaration, attached medical records at 37.  An MRI was conducted on April 21, 2003.  It revealed "diffuse lumbar spondylosis and severe acquired spinal stenosis (narrowing of spinal canal) with marginal canal dimensions noted."  [P. 60]  Therefore, Dr. Growse approved surgery and "all related consultations/procedures for Plaintiff's lower back."  Declaration at 3.

On August 27, 2003, at the UK Hospital, the plaintiff underwent surgery on his back by Dr. Blades [pp. 43-44].  A laminectomy of the L3 and L4 was performed for decompression of the spinal cord [pp. 43-44].  The surgery was successful and the plaintiff was discharged from UK on August 29, 2003 [pp. 43-44].  On September 8, 2003, he was seen by his FMC-Lexington physician, Dr. Dankwa, to whom he complained of numbness in the left facial area, neck, and right leg [p. 46].  Plaintiff's physician immediately called Dr. Blades, who reported that some degree of numbness in the lower extremities was normal following surgery [p. 46].

It is at this point that the parties have widely divergent views of events. Plaintiff had a post-operative visit with Dr. Blades on September 15, 2002.  In a letter

of that date to Dr. Dankwa, Dr. Blades noted that the plaintiff continued with complaints of right hip and knee pain, left facial numbness, and also of left eye pain; and the doctor concluded the letter as follows:

> . . . With regard to his facial exam, he does have decrease sensation in a V1, V2 and V3 distribution on the left, in additional to a depressed corneal response on the left.
>
> Mr. Bilderbeck should be evaluated with regard to his numbness and I have recommended that he undergo an MRI of the brain with and without contrast.  Regarding his knee and hip issues, I have recommended that he obtain a plain x-ray of his knee and hip and possible referral to Orthopedics for further evaluation and treatment.  We have scheduled him for the MRI today and we will review that study upon its availability.

Record No. 34, p. 68.  Pointing to this report, Dr. Growse has described the plaintiff, at the post-operative stage, as doing well, recovering normally, and also ambulating normally.  *Id.*, declaration at 2.  Therefore, he did nothing further.  The plaintiff's version is that he continued to have the same complaints, and despite Dr. Blades's recommendation for an MRI of his head, an orthopedic consultation, and an MRI and x-ray of his knee and hip, Dr. Growse approved only the MRI of his head, thereby showing deliberate indifference to his other serious and painful medical problems.  In reply, the doctor notes that in Dr. Blades's above-quoted letter, her language with regard to orthopedics was only that a referral might be "possible," while the MRI language was "stronger," and so Dr. Growse approved the MRI of the plaintiff's head.

On October 24, 2003, Dr. Blades wrote again, confirming that the MRI of the plaintiff's head showed no evidence of any problem causing numbness in the plaintiff's facial area  [p. 50].  This time, in a letter to the plaintiff, Dr. Blades concluded as

14

follows:  "I recognize that you still have symptoms but perhaps at this point referral

to a neurologist in addition to follow-up with an Orthopedist might be in order."  *Id*.

The defendant summarizes the conclusion of this letter with the following language:

"Dr. Blades concluded that the Plaintiff's subjective complaints remained unexplained,

and she recommended looking elsewhere for the problem, if necessary."  [P. 50]  With

regard to why he did not look further, Dr. Growse has sworn as follows:

> Plaintiff's records show he has believed without medical evidence,
> at least as long ago as 1998, that he is in need of surgery in the cervical
> spine area for nerve damage [pp. 5-8].   However, his belief is not
> medically sound, because there is no known medical condition of the
> neck known to cause symptoms in the face.  The facial nerves and the
> other cranial nerves do not exit through the vertebrae in the neck as the
> spinal nerves do.

Declaration at ¶ 10.  Further, Dr. Growse has declared that Plaintiff Bilderbeck was

well enough to return to his prison job on October 22, 2003, and he worked there on

a full-time basis for almost 11 months, until his transfer in September of 2004.  The

plaintiff, however, has pointed to a doctor's directive in his medical records, which

shows that he was limited to only 4 hours of work per day.  In his reply, the defendant

admits he was wrong about the work restriction, but argues that it is only a minor

oversight not relevant to this case.

The plaintiff continued to complain of nerve problems in his face and neck, and

on December 19, 2003, he wrote to Dr. Dankwa, claiming to have persistent trouble

with nerves in his face and requesting an "MRI of my neck where the nerve damage

is coming from."  [P. 61-63]  Dr. Growse states that despite the plaintiff's normal MRI

in September, he "approved a neurological consultation to ensure no significant findings were overlooked by the MRI and other examinations," and the consultation took place in March of 2004.  The plaintiff complains that the December-to-March delay demonstrates the doctor's deliberate indifference to his pain.

Dr. Growse states that "[t]he neurologist found nothing related to any neck pathology during his exam of Plaintiff.  Again, Plaintiff's subjective complaints of numbness were found to be medically inconsistent and unexplainable by the neurologist [pp. 51-52, 55, 58-59]." *Id*.  The defendant doctor points out that he also approved consultations for the examination of Plaintiff's eye complaints, "again resulting in no medical findings [pp. 58-59, 65-67]."  Dr. Growse declares, "Based upon the lack of any objective medical findings of head, neck, or eye problems after Plaintiff's back surgery, and the lack of medical soundness to his subjective complaints, I properly did not approve any further consultations or procedures for Plaintiff [p. 55]."

The plaintiff counters that Dr. Growse lacked medical findings because the doctor had not approved any testing for localizing the pathology of the plaintiff's complaints.  The plaintiff also points to the same neurologist's report of March of 2004 [p. 52] to support his very different view. He points to the paragraph where the neurologist has written that she "agreed with this gentleman that we may wish to consider MRI of the head with MRA, and MRI of the cervical spine to further evaluate this."  The plaintiff complains that this shows that Dr. Growse had treatment options

16

presented by the expert with whom he had consulted and yet chose to ignore the recommendations.  The plaintiff also claims that on May 11, 2004, Dr. Dankwa told him that every recommendation had been denied by Dr. Growse, including Dr. Dankwa's request for an MRI of the cervical spine and an MRI of the head with MRA. Additionally, shortly after this conversation, Captain Nester, head of the prison therapy department, purportedly told the plaintiff that he had recommended further testing, but that Dr. Growse had denied it.

Each party points to the plaintiff's left hip surgeries and other past medical issues, which are not at issue, as examples of the other party's similar pattern of dealing with the plaintiff's care after his back surgery.  The defendant describes his view of the plaintiff's conduct with regard to needing the hip surgeries and needing more care after his back surgery:

> In my medical opinion, as far back as 1998, Plaintiff decided on his own he needed neck surgery, and made subjective complaints of facial and other numbness/pain after his August 2003 back surgery, in an attempt to have the neck surgery approved.  Plaintiff has a history, predating his incarceration, of seeking medical procedures, including liposuction of the mid-section and facial area in the late 1980s, which may best explain the subjective complaints of numbness of the facial area. [p. 3].

Record No. 34 at p. 6.

In contrast, the plaintiff claims that the 22-month period of suffering between the first hip surgery and the later repair is typical of the same deliberate indifference to the plaintiff's complaints which was displayed by the defendant doctor at other times.  Dr. Growse is alleged to have been equally callous in refusing to see the

17

plaintiff when his hip dislocated, as he was non-responsive to the plaintiff's complaints after his August 2003 back surgery.  In fact, argues the plaintiff, Dr. Growse's knowledge of the plaintiff's neck and hip pain complaints for 6-7 years and refusal to investigate these known complaints illustrate the defendant's deliberate indifference. The plaintiff complains of his care and his lack of care, from his August 2003 back surgery to his July 2004 filing of this case:

> Only one MRI of the head was conducted without MRA; No x-rays of the hips and knee were approved by Dr. Growse as recommended by Dr. Blades and Dr. Dankwa; No MRI of the cervical spine was approved by Dr. Growse as recommended By Dr. Blades and Dr. Dankwa; No orthopedic evaluation was approved as recommended by Dr. Blades and Dr. Dankwa; Had Dr. Growse approved these tests then the diagnoses made by Dr. Stanley ad FCI-Butner could have been made several years earlier, saving the plaintiff from years of pain and suffering.

Record No. 39 at 16-17.

One year after his back surgery, on September 2, 2004, the BOP transferred Plaintiff Bilderbeck from FMC- Lexington to the Low Security Correctional Institution in Butner, North Carolina, where he is currently residing.  The defendant suggests that he was medically cleared as healthy enough for a non-medical institution and points to his transfer evaluation [p. 58] by Dr. Dankwa.  The plaintiff counters that the decision was based on limited medical data, however, because Dr. Growse refused to perform diagnostic testing of his complaints, except for one normal MRI of his head.

The plaintiff points out that upon his arrival at the new prison, the treating physician(s) recognized the severity of his complaints and appropriately ordered neurological and orthopedic consultations; an MRI of the cervical spine; a nerve

conductor test of his spine and right leg; x-rays of his right  hip and shoulder; and an MRI of his right knee.  More importantly, the findings of these tests reveal that the plaintiff had several serious medical conditions when he arrived from FMC-Lexington. The plaintiff attaches some medical records from this period of evaluation at Butner as Exhibit 7 to his response.  The defendant complains of the evidentiary use of these medical records as improper hindsight, and he also scrutinizes the contents of those records, noting that the plaintiff's problems were progressive or degenerative in nature, worsening over time; and that a  recommendation for surgery is an ultimate solution for many such problems the plaintiff has, but not the only one.

A motion to dismiss under Fed.R.Civ.P. 12(b)(6) for failure to state a claim "should not be granted unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  A complaint should be dismissed pursuant to Rule 12(b)(6) only if there is not law to support the claims, if the alleged facts are insufficient  to  state  a  claim,  or  if  on  the  face  of  the  complaint  there  is  an insurmountable bar to relief. *See Rauch v. Day & Night Mfg. Corp.*, 576 F.2d 697 (6th Cir. 1978).

The plaintiff is claiming that deliberate indifference has been exhibited to his serious medical needs in violation of his Eighth Amendment rights.  "In order to state a cognizable claim [under the Eighth Amendment with regard to medical care] a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate

19

indifference to the plaintiff's serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  Therefore, a prisoner must show both "deliberate indifference" and "serious medical needs." *Id.*  Deliberate indifference may be "manifested by prison doctors in their response to a prisoner's needs or by prison [staff] in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* at 104.  *See also Westlake v. Lucas*, 537 F.2d 857 (6th Cir. 1976).

The court cannot conclude at this time that the plaintiff will not be able to prove that the defendant was deliberately indifferent to his serious medical needs and thus violated the Constitution's Eighth Amendment.  No discovery has taken place and material factual disputes preclude a summary decision on the plaintiff's remaining claim.  Therefore, this claim will be permitted to go forward to discovery, under instructions which will be set out in a separate order.

<u>CONCLUSION</u>

Accordingly, the court being advised, **IT IS ORDERED** as follows:

(1)    The motion of Defendants BOP and Dr. Michael Growse to dismiss [Record No. 34] is **PARTIALLY GRANTED**, to the extent that

(a) the following are **DISMISSED WITH PREJUDICE**:  (i) all claims against the Federal Bureau of Prisons; (ii) all claims for injunctive relief; and (iii) the damage claims against Defendant Growse in his official capacity; and

       (b) the following are **DISMISSED WITHOUT PREJUDICE**:  (i) all claims against Defendant Deborah Blades; and (ii) the plaintiff's negligence claims under the FTCA.

      (2)    the remainder of the motion to dismiss, or in the alternative for summary judgment [Record No. 34], is **DENIED WITHOUT PREJUDICE**.

    Signed on August 3, 2005

*Jennifer B. Coffman*
JENNIFER B. COFFMAN, JUDGE
U.S. DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY